The People of the State of New York, Respondent, v
Manuel Garcia, Appellant.

First Department, February 7, 1980

---

**APPEARANCES OF COUNSEL**

*Philip L. Weinstein* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Robert J. Carlucci* of counsel *(Alan D. Marrus* with him on the brief; *Mario Merola, District Attorney),* for respondent.

**OPINION OF THE COURT**

BIRNS, J.

We would affirm the convictions of the defendant. With our dissenting colleagues, we share the same constant concern that each defendant in a criminal case should receive a fair trial. We cannot agree, however, with the dissenters' conclusion that the convictions of this defendant should be reversed because of "the pervasively unfair character of the District

Attorney's cross-examination of the defendant" and that "[i]n some instances the unfairness was compounded by the trial court's rulings and comments."

It appears to us that we are confronted with a hypercritical evaluation of the trial record, particularly the analysis of those portions of the defendant's cross-examination which have been utilized to support the dissent. Our analysis of the record and the illustrative portions shows the prosecutor to be aggressive and on occasions, not judicious in fulfilling his prosecutorial function at the trial. But such conduct, faulted in this case, did not operate to deny the defendant "his fundamental right to a fair trial." Hence, recourse by our dissenting colleagues to the rule in *People v Crimmins* (36 NY2d 230, 238), as justifying reversal of the convictions is not warranted. Moreover, from the same illustrative portions of the testimony, there is no basis for an objective conclusion that the trial court exacerbated the instances of misconduct charged to the prosecutor.

We do not need to quarrel whether or not the guilt was overwhelming for the dissent agrees that "the evidence of defendant's guilt is persuasive and more than sufficient to justify the verdict."

The dissent has set forth with accuracy the facts concerning the crimes attributed to the defendant. There is no need to outline the occurrence which led to the defendant's arrest on the evening of May 18, 1977 and which brought about his indictment for the crimes of assault in the first degree and criminal possession of a weapon in the second degree. We note that the jury convicted the defendant of assault in the second degree and criminal possession of a weapon in the third degree.

In affirming the convictions, we find it necessary to respond to the attack made by the dissent on various portions of the cross-examination.

In criticizing the District Attorney's effort to show the defendant's source of money in obtaining cash bail of $2,500, the dissent argues that questions addressed to this subject served no legitimate purpose but amounted to an invitation to the jury to speculate that the bail money was derived from uncharged criminal acts.

The defendant during cross-examination had stated that the money for his bail was not his. As we read the record, that is the point at which cross-examination on this subject ended.

The dissent agrees that the trial court had properly permitted the defendant to be cross-examined under *Sandoval* (34 NY2d 371) as to previous misdemeanor convictions arising out of burglary charges.

In our view, there is no basis for the dissent's observation that the trial court "effectively placed the seal of judicial approval on a wholly improper interrogation."

We note that the defense counsel did not ask at this time that the court in any way take action against the prosecutor.

■ We agree with the dissent that the defendant's bail status would appear to be irrelevant to the issues of guilt or innocence, or even credibility. Hence there appears to have been no justification for the District Attorney's questions on this subject. However, inasmuch as the inquiry was very brief, we should not be sidetracked by claims that the jury speculated that the bail money's source was uncharged criminal acts and, in any event, this brief inquiry, in the fact of the clear proof of guilt, could not have contributed to this verdict.

■ As to the "methadone" issue, it was the defendant who, under direct examination, offered testimony that he was on methadone thus inviting cross-examination on that subject. The District Attorney's question, referring to methadone, "That's a narcotic drug, right, you know that?" was improper, particularly since methadone has been explicitly excluded from the definition of narcotic drug in the Penal Law since 1975 (Penal Law, § 220.00, subd 7; and Commentary thereunder, McKinney's Cons Laws of NY, Book 39, Cumulative Annual Pocket Part 1979-1980). The Assistant District Attorney should have been aware of that fact. We note, however, that there was no objection or correction by defense counsel. It does not appear to us that the impropriety was of such moment as to be considered a strong factor justifying reversal.

■ Defense counsel appropriately objected to the question which followed closely: "Are you presently under the influence of methadone?" Whether this objection was to form only or to substance is not clear. The ensuing colloquy between counsel, however, impelled the court to observe that it had the responsibility in the first instance to determine whether the witness was competent to testify, and indicated that for that reason the question was allowed.

"In general, all persons offered as witnesses are presumed to be competent until the contrary is shown to the satisfaction of the court, by which as a general rule, all such questions are to

be determined" (Richardson, Evidence, 10th ed, Competency of Witnesses, § 385).

The statement of the court appears to have been an answer to the statement of the District Attorney that the competency of a witness on the stand is always an issue. The court attempted to demonstrate that the determination of that issue was for the court and not the jury.

The dissent has elaborated on this aspect of the cross-examination as demonstrative of the District Attorney's unfairness and as derogatory of society's worthwhile effort to respond to its chronic narcotics problems. The dissent finds that the District Attorney was implying that an addict on a methadone program is prone to commit violent acts.

If this was the District Attorney's purpose then the criticism contained in the dissent is justified. But the record on this point was not so extensive or so clear as to make this purpose as apparent as the dissent claims it was.

Finally, the dissent is critical of the District Attorney's statement in front of the jury that the defendant went to trial in this case because unlike other cases involving the defendant, he was unable to obtain probation. Objection to this statement was made and sustained. The statement was inappropriate and had no relevancy to any of the issues before the jury. It could only serve to prejudice the defendant.

■ Although the court did not instruct the jury as it might have done to disregard the statement of the District Attorney, the court in its charge instructed the jury that only the sworn testimony could be considered evidence. It is to be presumed, in the absence of a showing to the contrary, that the jury met its responsibility to render a fair and impartial verdict on the evidence before it.

■ It is regrettable that the District Attorney by improper, unnecessary questions has brought this case close to the point of reversal. However, we cannot say that the defendant's trial was unfair. This trial, like most trials, was not, as we have noted, without blemishes and failings. But because a trial is not perfect does not mean that the trial was unfair. Put another way, "A defendant is entitled to a fair trial, but not a perfect one" (*Lutwak v United States,* 344 US 604, 619). As in the *Crimmins* case (36 NY2d 230, 238), "[t]here is no predicate here * * * for any claim that this defendant * * * was deprived of any * * * basic right." (See, also, *People v Brown,* 62 AD2d 715, affd 48 NY2d 921; *People v Kingston, 8*

NY2d 384, 387.) Therefore, a reversal, on the ground that the defendant did not receive a fair trial, is not warranted.

The close difference of opinion which divides this court on this issue of a fair trial serves to remind us of the proper role of a prosecutor. "The [District Attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *(Berger v United States,* 295 US 78, 88 [1934]).

Finally, we do not agree with defendant's contention that the jury's verdict of guilty of assault in the second degree is repugnant to the verdict of acquittal of criminal possession of a weapon in the second degree. The elements of these crimes are not identical. While it may appear that these verdicts are inconsistent they are in fact not, as there is a rational theory which can support each one *(People v Pugh,* 36 AD2d 845, 846). In finding the defendant not guilty of criminal possession of a weapon in the second degree the jury may have concluded that the defendant possessed the weapon initially without any intent to use it unlawfully but that in the course of the altercation with Moreau decided to and did use the weapon offensively, that is, beyond the lawful bounds of self-defense. In any event, verdicts which are inconsistent but not repugnant are valid *(People v Torres,* 5 AD2d 134, affd 5 NY2d 804, cert den 359 US 993; *People ex rel. Troiani v Fay,* 13 AD2d 999, cert den 368 US 1003).

Accordingly, the judgment of the Supreme Court, Bronx County (SILBERMANN, J., and a jury), rendered August 1, 1978, convicting the defendant of the crimes of assault in the second degree and criminal possession of a weapon in the third degree, and sentencing him to concurrent terms of two and a third to seven years' imprisonment, should be affirmed.

SANDLER, J. (dissenting). In *People v Crimmins* (36 NY2d

230, 238) the Court of Appeals restated a fundamental principle in now familiar words: "So, if in any instance, an appellate court concludes that there has been such error of a trial court, such misconduct of a prosecutor, such inadequacy of defense counsel, or such other wrong as to have operated to deny any individual defendant his fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial, quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction. The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right."

In this case, the defendant was denied "his fundamental right to a fair trial" by the misconduct of the prosecutor.

The defendant was convicted of assault in the second degree and criminal possession of a weapon in the third degree. The People's evidence discloses that one Frank Moreau, a cab driver and auxiliary policeman, had undertaken to assist in diverting traffic from a street on which an accident had occurred, that the defendant, driving a vehicle, took exception to this effort, and that an altercation ensued which culminated in the defendant firing two shots at Moreau, one of which struck him in the thigh. The defendant then fled and was pursued by police officers who had been alerted by Moreau. He was found hiding in an alley, a gun on a ledge close by.

The defendant admitted the altercation with Moreau but testified that a third person had fired the shot during the course of the altercation, and that his apparent flight was in fact an effort to pursue the real culprit.

The jury required a very considerable time to reach a verdict and at one point reported itself deadlocked. However, the evidence of defendant's guilt is persuasive and more than sufficient to justify the verdict.

Nonetheless the conviction should be reversed because of the pervasively unfair character of the District Attorney's cross-examination of the defendant. In some instances the unfairness was compounded by the trial court's rulings and comments.

Preliminarily, it should be noted that a very high proportion of the District Attorney's questions were improper in form, a fact that merits comment only because the District Attorney had assumed throughout the trial the right to include in arguments addressed to evidentiary questions demeaning com-

ments about defense counsel's supposed lack of knowledge of the law of evidence. More important, many of his questions either assumed facts that were not in evidence or proceeded on the basis of a distorted or misleading version of the defendant's earlier testimony.

Finally, and what seems to me decisive here, whole groups of questions were quite clearly designed for the sole purpose of inducing the jury to engage in unjustified prejudicial speculation.

A complete analysis of the improprieties that occurred would unduly extend this opinion. The following represent the highlights:

1. In his direct examination the defendant indicated that he was having difficulty since his arrest in contributing to the support of his children because of "this problem." This passing comment gave rise to the following remarkable series of questions on cross-examination:

"Q Mr. Garcia, you were—you didn't have money, right, at the time this happened?

"A I have four or five dollars.

"Q And in this past year you haven't been able to support your two children very well? * * *

"A Sure. Well, from the time when I started in the methadone program, at the beginning I was receiving help from Social Security; I was like that for two or three years.

"Q Well, during the past year from May 18 to now, have you been working? * * *

"A I worked until about nine months ago when I lost my license and now I dedicate myself—I was working as a painter and fixing apartments.

"Q But you have had money, right? * * *

"A Well, what I earn is not enough to support myself.

"Q I see. You were out on twenty-five hundred dollars bail, aren't you, Mr. Garcia? Yes or no? Two thousand five hundred dollars bail?

"MR. KING: Judge, I object—just a minute, please.

"THE DEFENDANT: That money is not mine.

"MR. KING: I object to that as being irrelevant, the bail Mr. Garcia is on.

"THE COURT: The bail has nothing to do with it. But the amount of money does. In view of his statement—

"Q Is that true?

"A That money is not mine.

"Q Oh, I see. But you are out on two thousand five—two thousand five hundred dollars bail; is that right?

"A Yes.

"Q And you have been out on that bail since—

"MR. KING: Judge, I object.

"Q —since the end of May 1977, isn't that correct?

"MR. KING: Judge, I object to going into that. He said that it is not his money.

"THE COURT: But he has also said—and I presume this is the reason for it, that he hasn't worked, but he has been out. I suppose that is what the District Attorney is laying a foundation for the question that he is asking.

"Your objection is overruled.

"Q You have been out on bail—I'll repeat the question—you have been out on bail since the end of last May, 1977?

"A Yes."

The District Attorney's questions with regard to the amount of bail on which the defendant was released served no legitimate purpose. The intent of these questions was obvious, particularly when considered together with the District Attorney's cross-examination of the defendant with regard to three misdemeanor convictions between 1968 and 1970, arising out of burglary charges, which the trial court had appropriately permitted after a *Sandoval* hearing.

What occurred in the above sequence was a wholly unjustified effort to invite the jury to speculate that the bail money was derived from uncharged criminal acts. The trial court's observations that the questions were directed to "the amount of money * * * that he hasn't worked, but he has been out" effectively placed the seal of judicial approval on a wholly improper interrogation.

2. In his direct examination, the defendant acknowledged having been convicted of misdemeanors in 1968 and 1970, stating that he had then been a user of drugs, and that for the last seven years he had been in a methadone program. This provided the springboard for the following questions by the District Attorney on cross-examination:

"Q Incidentally, you were on methadone on May 18, 1977, weren't you?

"A Yes.

"Q That's a narcotic drug, right, you know that?

"A I don't know—the United States Government to help us addicts, especially those who wish to help themselves—

"Q Are you presently under the influence of methadone?

"MR. KING: I object to that question, whether he is under the influence of methadone.

"MR. HRABSKY: His competency on the stand is always in issue.

"THE COURT: That is in issue as to whether he is competent to testify.

"THE DEFENDANT: I think if I am competent, to sit here and to sentence me whether I do good or bad, I think that I am competent to testify here.

"THE COURT: Let me say parenthetically, it would be remiss of the Court to permit somebody to take the stand who wasn't competent to testify; that is why I allowed such a question.

"A Well, I am still continuing.

"Q Are you presently under the influence of methadone, yes or no?

"MR. KING: Judge, I am going to object to the form of the question.

"THE COURT: That form is improper. The form of that is improper.

"The question is if you are taking methadone—if you are taking methadone, can you still testify proper?

"THE DEFENDANT: I am sorry, your Honor.

"THE COURT: The question was, if you are taking methadone, do you understand what is taking place now?

"THE DEFENDANT: Yes, I understand.

"THE COURT: All right, fine. Let's move on then, Mr. Hrabsky."

Once again the prosecutor's improper purpose is not difficult to discern. By identifying methadone as a narcotic drug and inquiring whether the defendant was "on methadone" on the day of the incident, he sought to evoke in the jury the negative emotional responses associated with that term and to invite the jury to conclude that someone in a methadone program is more likely than the average person to engage in acts of violent criminality. The District Attorney's subsequent

effort to impeach the defendant's credibility by asking if he were presently "under the influence of methadone," and the District Attorney's claim that it was relevant to defendant's competence to testify, compounded the unfairness.

Methadone programs are an important and integral part of our society's effort to respond to aspects of the narcotic problem. Their purpose is to provide drug addicts an opportunity to function in a normal, law-abiding way. For an addict to participate in such a program for an extended period of time is obviously to his credit, and not a basis for the attack that occurred here.

I am aware of no support whatever for the District Attorney's implication that an addict who participates in a methadone program is more likely as a result to engage in violent acts or may not be competent to testify as a witness. The District Attorney's attempt to suggest such a correlation was not justified, and the trial court's comments, appearing to confirm the possibility of a relationship between attendance at a methadone clinic and competence to testify, clearly aggravated the prejudice.

3. Later on in the cross-examination occurred an incident less significant than the others, but still meriting comment.

Under intensive cross-examination as to whether he had shot Moreau, the defendant complained that he had not been given a paraffin test. The transcript reveals the following:

"A It's so easy to know when a person shot a person, taking a test. Why they don't do it to me? Because this is a frame. (In English)

"Q You are an expert on tests?

"A No, I say, it's easy to take a person, shot a gun, only taking the test. (In English)

"Q Then you know the person taking the test is no good, Mr. Garcia?

"A I don't. (In English)

"Q It's only in Dick Tracy it works; isn't that right, Mr. Garcia?

"A I don't. (In English)"

It is understandable that the District Attorney was annoyed by defendant's allusion to the paraffin test and believed this to be a false issue. There are appropriate ways to respond to such an issue. What occurred here was not such a response.

4. Approaching the end of the examination, the prosecution climaxed his cross-examination with the following:

"Q Did you plead guilty to petit larceny, in August 27th, of 1969, and received a sentence of Probation? Yes, or no, Mr. Garcia?

"A Every time I have doing something wrong that I know I'm wrong, that I'm guilty, but not this time. (In English)

"Q Oh, every time?

"A If I said to myself, 'Manuel, you did it, and you to pay.' I pay. (In English)

"Q Except when the payment gets kind of high, doesn't it?

"A I don't know. (In English)

"Q You got a break there, didn't you?

"A I don't. (In English)

"Q So if you are going to get Probation, you'll take a plea, Mr. Garcia?

"A I don't take no probation. They give it to me. (In English)

"Q They gave you a probation? And you weren't offered probation here; were you, Mr. Garcia?

"MR. KING: I object. I object.

"THE COURT: Sustained.

"MR. KING: And now I ask for the withdrawal of a juror, and the declaration of a mistrial.

"THE COURT: That is denied.

"MR. KING: This is utterly improper.

"MR. HRABSKY: It's not.

"MR. KING: It's absolutely improper.

"THE COURT: Please!

"MR. HRABSKY: I have no other questions.

"THE DEFENDANT: I no going to . . .

"THE COURT: Ladies and Gentlemen, I must make a ruling, because . . .

"THE DEFENDANT: You put too many things on the mind of a jury.

"THE COURT: The application for a mistrial is denied."

In this sequence the District Attorney quite purposefully undertook to convey to the jury that the defendant would have entered a plea of guilty if he had been assured of

probation. It is not easy to envisage more objectionable prosecutorial behavior.

For the reasons stated above, the judgment rendered August 1, 1978, convicting defendant of assault in the second degree and criminal possession of a weapon in the third degree and sentencing him to concurrent terms of 2⅓ to 7 years, should be reversed, and the case should be remanded for a new trial.

KUPFERMAN, J. P., and BLOOM, J., concur with BIRNS, J.; FEIN and SANDLER, JJ., dissent in an opinion by SANDLER, J.

Judgment, Supreme Court, Bronx County, rendered on August 1, 1978, affirmed.