■ THE PEOPLE OF THE STATE OF NEW YORK, v PAUL MONACO. — Motion for resettlement granted and the order of this court, entered on July 16, 1981 [83 AD2d 512], recalled and the order resettled, and the memorandum decision filed therewith recalled and a new memorandum decision substituted therefor as follows: Judgment, Supreme Court, New York County (Greenfield, J.), rendered June 10, 1980, convicting defendant upon a jury verdict of manslaughter in the second degree and sentencing him to a maximum term of 10 years, reversed, on the law, and a new trial ordered. It will never be known whether defendant was correct in his assumption that the 13-year-old victim of this homicide, Ciprian Septimo, Jr., had entered defendant's apartment building as a burglar. It is certain that Septimo was an intruder on defendant's property and was seen by defendant on a platform outside of the third-floor rear windows of the building, apparently having gained this height by climbing up the protective bars of windows facing on an airshaft. It was here that he was shot by defendant. The jury acquitted defendant of murder in the second degree and manslaughter in the first degree and thus conclusively determined that he had had no intention of killing or even injuring the boy. It was within the admissible evidence for the jury to have found as it did that defendant was guilty of manslaughter in the second degree in that he recklessly caused Septimo's death. We would not hesitate to affirm that verdict if it did not appear that defendant's right to a fair trial and a possible acquittal of all charges was compromised by the admission of testimony that had little useful purpose and could only have aroused sympathy for the victim and his family and animus against the defendant. The medical examiner testified that Septimo was five feet one and one-half inches tall and weighed 80 pounds. He stated that he had heard that the boy suffered from a heart condition and asthma but that he had found no evidence of these diseases at the autopsy. This competent medical evidence, plus testimony that Septimo was exceedingly deaf, would have been sufficient for the prosecution of these charges, especially since it could not be denied that, whatever Septimo's physical condition, such condition did not prevent him from activity as strenuous as making his way to this third-floor platform. Instead, Septimo's school principal was permitted to testify that he was a delicate child, that he suffered from myopia and wore thick glasses, that "we had him marked for limited activity because Ciprian had open heart surgery [sic], he had a cardiac problem" and "[H]e was asthmatic as well". Septimo's younger sister, who was 12 when he was killed, was permitted to testify that her brother did not play any strenuous games, that he played only with children who were six to eight years old, and that he had "stitches" on his body "going from his chest around to his back". The father of the victim was called to the stand although it was known that he

was "very disturbed" by the homicide and that he harbored a belief that defendant and his brother had purchased this apartment building just to be able to kill his son. The father broke down on the stand. Some of this testimony was from witnesses incompetent to testify to Septimo's physical condition; most of it conflicted with the available competent testimony, and taken as a whole it had no redeeming probative value. The environment so created must necessarily have prejudiced the defendant and a new trial is required. Concur — Sandler, Ross and Lynch, JJ.; Murphy, P.J., and Birns, J., dissent in separate memoranda as follows.

Murphy, P.J. (dissenting). The trial court gave a justification charge with regard to the defense of both person and property. Essentially, the court instructed that the defendant could have lawfully used deadly physical force upon the decedent if he reasonably believed the decedent was using, or about to use, deadly physical force upon him (Penal Law, § 35.15, subd 2, par [a]). It further charged that if the defendant reasonably believed the decedent was committing or attempting to commit a burglary in the subject building, he could have lawfully used deadly force if such was necessary to prevent or terminate the commission or attempted commission of such burglary by the decedent (Penal Law, § 35.20, subd 3). These portions of the charge reflect the fact that, at trial, the evidence had placed in issue (i) the decedent's appearance and (ii) his agility. Therefore, the prosecution was correctly given significant leeway in developing proof on each of these personal characteristics. The jury was properly permitted to consider these characteristics, in tandem, in determining whether the decedent presented an innocuous or a menacing figure to the defendant. The following observations may be made with regard to the aspect of the case relating to the decedent's appearance. First, the prosecutor properly introduced evidence that the decedent was wearing thick-lensed glasses for his myopia. The presence of the glasses on the decedent's face bore directly on his appearance. It also assisted the jury in deciding whether the decedent recognized the foreboding presence of the defendant as such; it also helped to explain why the decedent may not have been immediately responsive to the defendant's command to stop. Second, proof was properly received as to the decedent's deafness. Normally, he wore a hearing aid but he was not wearing one on the date of the occurrence. Again, the testimony as to decedent's deafness was pertinent to the jury's sound evaluation of all the evidence. For example, it permitted the jury to determine whether the decedent's countenance expressed puzzlement or belligerency upon the defendant's command to halt. Third, the trial court correctly allowed evidence as to the decedent's (i) heart condition and (ii) asthma. Although the defendant was not aware of these internal afflictions, maladies of this sort often manifest themselves in the general appearance, bearing or demeanor of an individual. Moreover, in this proceeding, the decedent had just engaged in physical activity that was sufficient to bring him onto the platform in the rear of the building. This activity, when achieved by an individual with a heart condition and asthma, may well result in a shortness of breath and visible signs of fatigue. Thus, it may not be absolutely stated that these two internal afflictions had no external manifestation on the date of the shooting. With regard to the decedent's agility or lack thereof, it has been stated that proof of physical capacity to execute an act is admissible to raise or negate an inference as to its performance by the person charged with its commission (Fisch on New York Evidence [2d ed, 1977], § 231, p 134). The defendant was the sole witness to the occurrence. At trial, the jury was presented with many variations of the occurrence in the defendant's own testimony and that of the police officers giving their account of the defendant's statements to them. In this background, the prosecution was properly given freedom to develop a testimonial composite

of the decedent's physical capabilities. This composite assisted the jury in reaching a conclusion as to the likelihood of whether the decedent made a sudden, athletic movement that could have been perceived or interpreted by the defendant as the use of deadly force or an attempt to complete a burglary. Although the decedent displayed a certain amount of physical ability in reaching the platform, a jury could only have arrived at an informed judgment as to what actually transpired if it were presented with the decedent's entire medical profile. Separate comment must be made on the testimony of the decedent's sister, Arleen, concerning his stitches. The trial court permitted this testimony to stand because its prior questioning of Arleen had produced answers suggesting that the decedent engaged in games and other physical activity. Even if the court's questions had not prompted answers unfavorable to the prosecution, the testimony as to the stitches was, as mentioned above, proper to give the jury an over-all medical picture of the decedent. Even though the decedent's father "broke down" at one point in his testimony, that minor aberration cannot validly be considered as an extraordinary or prejudicial event in a protracted trial of this nature. From the commencement of trial, the jurors realized that a child had been shot and it was to be assumed, as is normally the case, that there were one or more grieving relatives. There is no meritorious reason to believe that the jurors did not discount the father's grief in the context of this case and reach a dispassionate decision on the evidence. The testimony of the decedent's relatives and friends was, of course, relevant since it (i) established the decedent's physical characteristics and medical profile, and (ii) confirmed that the items on his person belonged to him and were not the proceeds of a burglary. The evidence relating to the decedent's (i) appearance and (ii) agility was not inflammatory but was crucially relevant to the disposition of the justification issue. In any event, the admission of that evidence was, at the very most, harmless error. Viewing the testimony most favorably to the defendant, there was some proof that the decedent might have placed his hands behind his hips when the defendant commanded him to halt. Surely, the defendant was not entitled to use deadly force in response to such harmless activity upon the decedent's part. Even if it were assumed that the decedent had burglarized the building before being discovered by the defendant, there was absolutely no necessity for the defendant to use deadly force upon the decedent as he stood harmlessly on the platform. From the verdict, it may reasonably be inferred that the jury found that the decedent was a frail child who did not appear to be a threat to the person or property of the defendant. The jury, necessarily, must have concluded that the defendant, from his safe vantage point on the fire escape, recklessly aimed his rifle and recklessly caused it to discharge. The verdict reflects a rejection of the justification defense, which, under the charge as given, permitted the jury to sustain such a defense even if the decedent was attempting to escape after the commission of a burglary. Upon the whole, this record indicates that the jury carefully considered all the evidence in a very objective manner. It acquitted the defendant of murder in the second degree and manslaughter in the first degree, but found him guilty of manslaughter in the second degree. Since there was more than ample evidence for the jury to conclude that the defendant recklessly aimed and fired his rifle, the judgment of conviction should be affirmed.

Birns, J. (dissenting). I cannot accept the majority's conclusion that a new trial is warranted because of prejudicial errors occasioned by rulings of the trial court with respect to the admission of certain testimony. In the face of the substantial evidence of defendant's guilt, the errors, if any, must be considered harmless and did not deny defendant a fair trial (*People v Garcia*, 72 AD2d 356, 358, affd 52 NY2d 716; see, generally, Harmless Error: The Need For A

Uniform Standard, 53 St Johns L Rev 541). Defendant's conviction for the crime of manslaughter in the second degree should be affirmed. The admission of testimony from the parochial school principal that the deceased child was myopic and was placed on limited school activity because of a cardiac condition, and from decedent's sister that her brother did not play strenuous games, even if improper, in my opinion did not prejudice the jury nor contribute to the jury's verdict that defendant was guilty of the crime of manslaughter in the second degree. In addition, there was no error in the testimony of deceased's father as found by the majority. A fear had been expressed that if called to the stand, deceased's father would testify that he harbored a belief that defendant and his brother had purchased the building just to be able to kill his son. The trial court preliminarily examined the witness outside the presence of the jury and then permitted the father to testify. The fact is that no such harbored belief was expressed by this witness in the presence of the jury and in no way was his testimony inappropriate or irrelevant. Although this witness was understandably emotional, the trial court commented upon the record that there was no outburst from the witness during a "carefully controlled" examination. The jury carefully evaluated the testimony, a conclusion which is supported by the fact that the jury acquitted defendant of the crime of murder in the second degree with which he was charged in the indictment, and manslaughter in the first degree, one of the lesser included crimes the jury was asked to consider. There appears to be no dispute that defendant, while on a fire escape of a building of which he was co-owner, fired the fatal shot at the deceased standing some 30 feet away on the edge of a roof covering an extension of the building. The defendant testified that deceased had moved one of his arms toward a rear pocket, but there is no evidence of any overt threatening gesture towards the defendant. In view of defendant's claim of "justification", the court carefully charged the jury that the burden was on the District Attorney to disprove the claim of justification beyond a reasonable doubt (Penal Law, § 25.00); that if defendant had, in the circumstances, a "reasonable belief" that he was confronted by a burglar threatening him with the use of "deadly physical force" (Penal Law, § 35.15) or that defendant had a "reasonable belief" that it was necessary to fire his weapon to prevent or terminate a burglary or an attempted burglary (Penal Law, § 35.20), defendant should be acquitted of the homicide charges filed against him. The physical evidence amply supported the verdict that the shooting was without justification. At the time the fatal shot was fired, the defendant was on a fire escape with one arm encircling a rung (somewhat above the level of the deceased) "to get", as he told a detective, "a better shot" at the deceased who was standing 30 feet away when the rifle "had gone off." Under these circumstances, the jury found beyond a reasonable doubt that the defendant could not have had a reasonable belief that the deceased threatened the defendant's life or that the shot was fired to prevent or terminate a burglary. The jury was instructed properly that the defendant's "reasonable belief" had to rest on what he saw or knew when he used his rifle. Although the deceased had in his pocket a screwdriver, 10 keys and an otoscope (a physician's flashlight for illuminating small enclosed areas of the body), items of which the jury was informed (or which were in evidence), the jury was instructed to ignore these items in considering what the defendant "reasonably believed" at the time — because the defendant could not have known of them. The items were discovered only when the deceased was searched after his body was found. The court instructed the jury not to consider, on this issue, other irrelevances; for example, that deceased was a "deaf mute", although telling the jury that may have explained the deceased's "failure to halt when commanded to do so." The jury apparently accepted defendant's claim that he had

not intentionally fired the rifle. Therefore, the evidence established beyond a reasonable doubt that defendant "recklessly" (Penal Law, § 15.05, subd 3) and without justification caused the death of Ciprian Septimo, Jr. (Penal Law, § 125.15). One final thought. Defendant was sentenced to an indeterminate term not to exceed 10 years. In imposing sentence the trial court accused defendant of "vigilantism" and said he had "stalked" the deceased. These observations might be appropriate if defendant had been found guilty of an intentional crime, such as murder in the second degree (Penal Law, § 125.25) or manslaughter in the first degree (Penal Law, §125.20). But he was acquitted of those crimes. Hence it appears that the factual bases expressed by the court upon which the sentence was imposed was inappropriate, as the remarks of the court did not jibe with the verdict of the jury. We have been considering a case with tragic overtones, a confrontation of a boy apparently bent on mischief and a property owner utilizing a most drastic means to safeguard his property from any intruder. Although one may understand the defendant's motive, there was no justification to use a firearm against an intruder who at the time posed no immediate threat either to life or property. Possession of a weapon invites misuse of that weapon. There was such an invitation and misuse in this case. However, the circumstances warrant the imposition of a lesser indeterminate sentence (see *People v Hazen,* 79 AD2d 945). Resettled order signed and filed.