■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RANDOLPH WOODHULL, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Lombardo, J.), rendered January 12, 1982, convicting him of two counts of murder in the second degree, upon a jury verdict, and imposing sentence.

Judgment reversed, as a matter of discretion in the interest of justice, and new trial ordered. The questions of fact have been considered and determined to be established.

The introduction by the prosecutor of hearsay evidence tending to link the defendant with an unrelated killing, and other instances of prosecutorial misconduct, although not objected to by defense counsel, were so highly prejudicial that there must be a reversal in the interest of justice.

Defendant was charged with murdering one Donald Spencer on or about December 19, 1979. Spencer had formerly been defendant's homosexual lover. His body was found with his hands and ankles tied with electrical cord, and a "tightly tied cloth gag" covering his nose, mouth and the upper part of his face. According to the medical examiner, death was due to asphyxia or suffocation caused by the tightly bound gag.

During the cross-examination of defendant's "alibi" witness, the prosecutor adduced the following testimony which was obviously inadmissible hearsay concerning the demise of an earlier boyfriend of defendant:

"Q. * * * [D]id you know that the defendant had a boyfriend by the name of Ronnie (ph) before he was seeing Mr. Spencer?

"A. I saw him once.

"Q. You saw Ronnie once, right?

"A. Yes.

"Q. And what did you tell the police about Ronnie?

"A. I said a friend told me that he was found dead.

"Q. And do you remember how he was found dead?

"A. He was on a vacant lot.

"Q. And do you remember in the vacant lot how he was found dead?

"A. He was found. He was tied up. He was on a vacant lot.

"Q. And who was the friend that told you about Ronnie?

"A. You mean told me that he was dead?

"Q. Yes.

"A. Some of my other friends, because they saw a picture in my house of Ronnie, and they said, oh, he was found on a vacant lot dead.

"Q. And you're sure about that, right?

"A. Yes.

"Q. Don't you remember telling Police Officer Jones that it was Ramsey Woodhull [defendant] that told you about that?

"A. No, Ramsey didn't tell me.

"Q. Well, I'm going to show you a police report, and I'd ask you to read it.

"THE COURT: Let's mark it for identification first.

"[PROSECUTOR]: It would be 5.

"THE COURT: Has defense counsel seen it?

"[DEFENSE COUNSEL]: Yes, Judge.

"THE COURT: Deemed marked People's 5 for identification.

"Q. I'd ask you to read that and see if it refreshes your recollection as to whether or not this man over here, Woodhull, told you about Ronnie?

"A. I didn't tell him that Ramsey Woodhull told me that his friend was dead. I told him that a friend told me that.

"Q. So you're saying that Detective Jones took it down wrong; is that right?

"A. Probably did. If he says that I said that Ramsey told me, Ramsey didn't tell me that.

"Q. It's your testimony that the defendant didn't tell you about that?

"A. That's right.

"Q. That this Ronnie and the defendant, they were gay lovers, right, beforehand?

"A. They were friends.

"Q. Well, were they lovers?

"A. I don't know. He only brought him by my house once.

"Q. And then he was found dead, tied up in a lot, right?

"A. Yes, that's what happened to him."

During summation, the prosecutor brought the matter up again, referring to the defense witness' testimony: "What else? He tells us about another unusual experience, another unusual coincidence. Who was the Defendant's boyfriend before Donald Spencer, this guy named Ronny. What happened to Ronny? He's found dead in a lot, tied up, tied up. *You think that's a coincidence?*". (Emphasis added.)

The line of questions and the prosecutor's remarks in summation were obviously intended to convey to the jury, by insinuation and suggestion, the impression that the defendant was guilty of killing his earlier boyfriend. Even though, amazingly, there was no objection, the prejudice created was such that the verdict cannot stand (see *People v Ashwal,* 39 NY2d 105; *People v Richards,* 78 AD2d 664; *People v Solomon,* 70 AD2d 516).

It is well settled that in a prosecution for one crime, evidence of uncharged crimes is inadmissible because of the inherent prejudicial nature of such evidence and the obvious danger that

a defendant may be convicted of the crime charged solely because he committed or may have committed an unrelated crime some time in the past (*People v Allweiss,* 48 NY2d 40; *People v Molineux,* 168 NY 264; Richardson, Evidence [Prince, 10th ed], § 170, and cases cited therein). While there are well-established exceptions to that principle (*People v Vails,* 43 NY2d 364; *People v Gines,* 36 NY2d 932; *People v Tucker,* 102 AD2d 535; Richardson, Evidence [Prince, 10th ed], §§ 171-180), here, it cannot be contended that any exception thereto was remotely applicable. Moreover, the error was inexcusable on the further ground that there was no competent proof of the uncharged crime (*People v Solomon, supra,* p 517) and no evidence connecting defendant with its commission (*People v Ashwal,* 39 NY2d 105, 111, *supra*).

As this court pointed out in *People v Richards* (78 AD2d 664, *supra*), "[e]xpressly commenting on irrelevant uncharged crimes is one of the most egregious of trial errors". As in *Richards* (*supra,* p 665), the prejudicial impact of this erroneously admitted evidence was compounded when the court referred to it in its charge, in marshaling the evidence.

We cannot agree with our dissenting colleague that the error was harmless, since we do not find that the evidence of guilt was overwhelming (see *People v Cook,* 42 NY2d 204; *People v Crimmins,* 36 NY2d 230).

The case against defendant rested entirely on circumstantial evidence (see *People v Burke,* 62 NY2d 860; *People v Bretagna,* 298 NY 323, cert den 336 US 919). In effect, it depended upon whether the jury believed the testimony of Detective Jones that, in the course of interrogating the defendant on February 1, 1980, defendant admitted to having fought with Spencer on December 15, 1979,[*] in the presence of Teddy. Jones' trial testimony does not comport with the videotaped conversation defendant had with an Assistant District Attorney who went to the precinct later the same day to record the statement defendant allegedly had made to Jones. During that recorded conversation, defendant insisted that he had last seen Spencer about "A year ago". Moreover, the Assistant District Attorney testified that they used the date December 19 and not December 15 during the videotaped conversation because "*it was our only frame of reference, the date the body was discovered*" (emphasis added). Significantly, the Assistant District Attorney never

---

[*] Although Spencer's body was discovered on December 19, 1979, the People contend that his death occurred on December 15, 1979, based on defendant's alleged admission that he had fought with Spencer on December 15, 1979 and the medical examiner's testimony that Spencer had been dead for at least three or four days and Spencer's aunt's testimony that she had spoken to him about 8:00 P.M. on December 15, 1979.

questioned defendant about December 15 and Jones never made a record any place of that date despite the obvious significance of such date and alleged admission, and never attempted to locate Teddy, who allegedly witnessed the fight of December 15 and who would have been a very important witness.

Additionally, the prosecutor made other highly inflammatory remarks during his summation and while, again, no objection was taken by defense counsel, we note that the remarks went far beyond fair comment on the evidence. Although the errors were not properly preserved by timely objection, under the circumstances of this case, the cumulative effect was to deprive defendant of a fair trial.

In view of the foregoing, we need not reach defendant's further claim that he was denied the effective assistance of counsel. Lazer, J. P., O'Connor and Lawrence, JJ., concur.

Weinstein, J., dissents and votes to affirm the judgment of conviction, with the following memorandum: Inasmuch as I disagree with the majority's assertion that proof of guilt in this case was not overwhelming, I cannot adhere to its conclusion that certain enumerated instances of prosecutorial misconduct warrant a reversal in the interest of justice of the judgment convicting defendant of two counts of murder in the second degree.

Where the sufficiency of the evidence is in issue, the facts must be viewed in the light most favorable to the People (see *People v Kennedy,* 47 NY2d 196, 203, mot for rearg dsmd 48 NY2d 635; *People v Benzinger,* 36 NY2d 29, 32) and with the assumption that "the jury credited the prosecution witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it" (*People v Benzinger, supra,* p 32). Viewed in this light, the proof adduced at trial clearly established beyond a reasonable doubt defendant's guilt of the murder of Donald Spencer.

Defendant and Spencer had conducted a long-term homosexual love affair prior to their breakup in about 1978. Around the time of their breakup, defendant and Spencer had a fight in the presence of Spencer's cousin, during the course of which defendant threatened to kill Spencer. Spencer thereafter became frightened and stopped seeing defendant on a regular basis. The parties came into contact on at least two other occasions when they argued about Spencer's involvement with a man named "Teddy".

Defendant admitted that he had been at Spencer's home on Saturday, December 15, 1979.[*] On that occasion, Spencer and

---

[*] Significantly, the People produced expert medical evidence showing

defendant, in the presence of Teddy, began arguing about Spencer's involvement with other men. Defendant admitted that he slapped Spencer around to the point where the latter was bleeding. When Spencer attempted to jump out a window, defendant forced him back on the bed. Defendant then applied towels and pillows to Spencer's face in an effort to stop the bleeding.

After relating this version of the above encounter with Spencer to the police, defendant voluntarily took part in a videotaped conversation with an Assistant District Attorney. Although the prosecutor erroneously referred to the date of the killing as December 19, 1979, defendant proceeded to render an extended account of what transpired at his last meeting with the decedent. After celebrating Spencer's birthday at a gay bar in Manhattan, defendant and Spencer returned to the latter's apartment where they engaged in sexual activities and continued drinking. The two became embroiled in an argument regarding Spencer's relations with Teddy. Defendant conceded that he had beaten up Spencer "kind of bad" while protesting "but I didn't really kill him, you know".

Defendant also stated that Spencer, who had drunk a large quantity of rum, began banging his head against a window. In an effort to protect Spencer from himself, defendant pushed him back on the bed and put a pillow on his head to halt the bleeding. Initially, defendant denied having tied up Spencer's hands and feet so as to prevent him from jumping out the window. When reminded of the statement he had just made to the police, defendant admitted that he had tied up a raving Spencer in an effort to control him. He vehemently denied, however, ever putting a gag in Spencer's mouth.

As per the testimony of the victim's aunt, the coat worn by defendant on the day of his videotaped interview had belonged to Spencer, who was last observed wearing it on Thanksgiving Day, 1979. It is reasonable to infer from this fact that at some point between late November and December 15, 1979, defendant had had sufficient contact with Spencer as to have acquired the latter's overcoat.

The lifeless body of Donald Spencer was found lying face down in bed without clothes, with the hands and feet bound and with pillows piled over the head. Defendant admitted that he had grabbed Spencer during the course of their final altercation, struggled with him, pushed him down on the bed, tied his hands and feet and pushed pillows on top of his head. Although he denied using a gag, defendant's admission that he attempted to

that at the time the autopsy was performed on Spencer's body on December 19, 1979, the victim had been dead for at least three or four days.

stanch the victim's bleeding is consistent with the existence of a tightly tied cloth around the victim's mouth partially obstructing the nose and upper portion of the face, and with his stated desire to quiet down Spencer. The testimony of Police Officer Story relating defendant's arrest on the morning following a brief trip to Philadelphia was entirely consistent with defendant's admission that he went to Philadelphia shortly after the incident he described. Furthermore, motive was convincingly proven and was obvious from defendant's own admissions of jealousy and rejection and from the testimony of the decedent's aunt and cousin regarding the nature of defendant's relationship with Spencer.

A reasonable view of the evidence reveals that defendant's statements, while somewhat inconsistent and not totally correspondent with the independent evidence in the case, constitute substantial admissions of guilt to a severe beating, binding and suffocation of Donald Spencer. Notwithstanding the equivocation as to the date of the crime's commission, defendant's admissions bear a substantial, if not total, resemblance to the facts of Spencer's murder, as evinced by the murder scene and the autopsy. The jurors, as assessors of credibility, were entitled to disbelieve defendant's equivocations and denials of guilt and, instead, to draw all reasonable inferences pointing towards guilt. It is well settled that "a jury faced with conflicting evidence may accept some and reject other items of evidence, absence [sic] any logical inconsistency in the jury's choice, regardless of whether that evidence is circumstantial or direct" (*People v Kennedy,* 47 NY2d 196, 201, *supra*). In my view, there was ample and overwhelming evidence of defendant's guilt. Inasmuch as the record cogently supports the verdict rendered, I decline to interfere with the jurors' proper execution of their legal function.

Nor do I subscribe to the majority's opinion that the cumulative effect of certain prosecutorial improprieties was so prejudicial as to have deprived defendant of his right to a fair trial. Defendant objects, in particular, to the prosecutor's elicitation of prejudicial and inadmissible hearsay regarding his prior violent conduct vis-à-vis Spencer and the alleged violent death of his former lover, Ronnie, as propensity evidence.

The fact that a trial was not without blemishes and failings does not necessarily imply that it has been unfair (*People v Garcia,* 72 AD2d 356, 360, affd 52 NY2d 716). Notwithstanding the fact that a defendant's trial may not have been error free, appellate courts are constrained to determine appeals without regard to technical errors or defects which do not affect the

substantial rights of the parties (CPL 470.05, subd 1). Reversing a judgment on the ground of prosecutorial misconduct constitutes an "ill-suited remedy" inasmuch as it "does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted" (*United States v Modica,* 663 F2d 1173, 1184, cert den 456 US 989).

Although several of the prosecutor's comments in the instant case are not deserving of accolades and would have been better left unsaid, defendant failed to register an appropriate protest sufficient to preserve a question of law as to most of them (CPL 470.05, subd 2; *People v Nuccie,* 57 NY2d 818; *People v Santiago,* 52 NY2d 865). While it may be said that the "conduct of this trial was far from ideal" and that the prosecutor was "overzealous", these comments, nevertheless, provide an insufficient basis for reversal (*People v Brown,* 48 NY2d 921, 923). It is my conclusion that this court should decline to exercise its interest of justice jurisdiction inasmuch as these indiscretions, emanating as they did from the prosecutor's overzealousness, clearly did not operate to deprive defendant of his right to a fair trial (CPL 470.15, subd 6, par [a]; see *People v Hopkins,* 58 NY2d 1079, 1083; *People v Gonzalez,* 102 AD2d 895).

It cannot be denied that the prosecutor's attempt to portray defendant as a man with a history of killing his lovers, coupled with the court's repetition of the allegation while marshaling the evidence, was improper and prejudicial to defendant. Expressly commenting upon irrelevant uncharged crimes has been condemned by this court as one of the most egregious of trial errors particularly where, unlike here, timely objection has been taken (see *People v Richards,* 78 AD2d 664). If not for the overwhelming evidence of guilt and the absence of a substantial likelihood that the verdict hinged upon this error, a reversal of defendant's conviction and a remittitur for a new trial might be warranted. Under the circumstances, however, the interests of justice, as I perceive those interests to be, do not warrant a reversal based on this error.

I have considered defendant's remaining contentions and find them to be without merit.